UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

Raul Correa,

                Petitioner,           **MEMORANDUM & ORDER**
                                     22-CV-02366 (NRM)

       -against-

Christopher Collins, Superintendent,
Great Meadow Correctional Facility

                Respondent.

----------------------------------------------------------------x

**NINA R. MORRISON**, United States District Judge:

      Pending before this Court is Petitioner Raul Correa's petition for writ of habeas corpus, in which he challenges his 2015 convictions for second-degree murder and criminal possession of a weapon. Proceeding *pro se*, Petitioner argues that a detective witness's narration testimony deprived him of a fair trial and that his aggregate sentence of forty years to life in prison is excessive. *See generally* ECF Nos. 1, 6, 9; *see also Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) ("[T]he submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest." (quotations omitted)). After careful consideration of the underlying record, Respondent's motion to dismiss, and Petitioner's responsive pleading, for the reasons set forth below, the Petition is DENIED.

## BACKGROUND

### I.    Shootings

The following factual summary is drawn from the evidence presented by the prosecution at Petitioner's jury trial, including but not limited to video surveillance footage.  As further discussed *infra,* Petitioner's convictions arise from a shooting of two men near a Brooklyn deli in October 2013.  Petitioner does not deny having shot the decedents, Tevin Beckles and Randolph Williams, but at trial argued that he acted in self-defense and was otherwise legally justified.

On the evening of October 18, 2013, Petitioner was at a deli in Brooklyn, New York, drinking beers with the decedent, an acquaintance named Tevin Beckles.  Just after 8:00 p.m., another acquaintance of the two men – a man known as June – entered the deli to confront Petitioner.  June told Beckles to leave the deli, which he did.

June proceeded to slap Petitioner across the face, hitting him so hard that it knocked Petitioner to the ground.  While on the floor, June patted down Petitioner, as if looking for a weapon, but quickly left the bodega emptyhanded.  From outside, June yelled at Petitioner, "I told you I didn't want to see you doing anything around this corner," before leaving the vicinity.  The deli's manager, Luis Paulino, and his father helped Petitioner up from the floor.  The incident angered Petitioner, but Paulino and Orlando Martinez, another deli employee, encouraged Petitioner to take it easy and go home.

Petitioner returned to the deli multiple times over the next ten minutes.  At one point, he argued with and pointed the gun at Beckles after he had returned to the deli.  Beckles once again left the deli; Petitioner followed him and pointed the gun at him again.  Petitioner, who lived on the same block where the deli was located, walked up and down the street looking for June.  A few minutes later, just before 8:30 p.m., Petitioner came across Beckles and another man, Randolph Williams, on the corner outside the deli.  The three men were seen yelling at and pushing each other, and during this exchange, Petitioner twice pointed his gun at the other two men.  After having the gun pointed at him a second time, Beckles took out his own gun but kept it lowered at his side.  Seeing this, Petitioner stepped backwards and took partial cover behind a fence, all the while keeping his gun aimed at Beckles.

Beckles started to raise but then lowered his gun.  Petitioner proceeded to shoot Beckles once in the chest.  After Beckles fell, Williams reached for the gun on the ground.  Petitioner shot Williams once in the stomach.  As the men lay on the ground, Petitioner walked up and gestured at them with his gun before returning the gun to his waistband and walking away.  The entire incident was captured on surveillance video obtained from a nearby New York Police Department Argus camera.

## II.  Police Investigation

Police responded to the shootings at approximately 8:40 p.m.  Beckles was pronounced dead at the scene while Williams died later at the hospital.  Ballistic evidence recovered from the crime scene included two discharged shell casings, two

fired bullets, and an unfired cartridge all from a .40 caliber handgun. Also recovered at the scene was an operable .22 caliber firearm, later confirmed to belong to Beckles.

During the course of the investigation, police spoke with multiple eyewitnesses including the deli manager, Luis Paulino; Lenger Bellefleur, a taxi driver who was stopped at a red light when he saw the fight and ensuing shooting before Petitioner fled, walking past Bellefleur's cab; Bernadine Cox, the fare in Bellefleur's cab at the time who heard gunshots, saw people running and saw one man slowly walking and placing an object in his waistband; and Lamia Barney, a friend of Beckles's who was in her apartment near the deli, from where she could hear the fight and gunshots, then ran outside and remained with Beckles as he died.

Later that same night, Paulino and Bellefleur each identified Petitioner via photo array. Paulino knew Petitioner as a regular patron of the deli, and had also watched the shooting via the store's video surveillance system. Bellefleur, on the other hand, had never seen Petitioner before, but "got a good look" at him after the shooting as Petitioner walked toward and behind the cab as he fled the scene. Based on these two positive identifications, an I-card was issued for Petitioner's arrest.

On October 21, 2013, Petitioner purchased a one-way ticket for a flight to Puerto Rico leaving the next day. Police arrested Petitioner on October 22, 2013, while he was en route to the airport. Upon his arrest, Petitioner was placed in a line up, from which Paulino and Bellefleur positively identified him as the shooter. Petitioner was subsequently charged under Kings County Indictment number 9224/2013 with two counts of murder in the second degree, N.Y. Penal Law

§ 125.25(1), and two counts of criminal possession of a weapon in the second degree, N.Y. Penal Law §§ 265.03(1)(b), (3).

## III.    State Court Procedural History

### A. Motion to Suppress

On October 14, 2015, a justice of the New York Supreme Court, Kings County ("trial court"), held a *Wade* hearing to determine whether the out-of-court identification procedures were unduly and impermissibly suggestive. *See United States v. Wade,* 388 U.S. 218, 242 (1967). Petitioner argued that the photo arrays were improper because the filler photos were not sufficiently similar in appearance, particularly because Petitioner was of a different race than the individuals in the other photographs, with different features and a lighter complexion. Petitioner identifies as non-Black Hispanic, whereas the filler photos were of Black men. ECF No. 7-3 at 53–54.[1] According to Petitioner, he impermissibly "[stood] out" during the photo array, which in turn made it too easy for the same witnesses to pick him out of a line-up two days later. ECF No. 7-3 at 54–56. Respondent, having introduced into evidence a color copy of the original photo array, argued that a photo array identification procedure is not "necessarily about matching [Petitioner] with people of identical race," but rather must account for all of his features, "including if he looks darker [skinned] in the picture than he might in person." ECF No. 7-3 at 56.

---

[1] Cites to the record refer to page numbers automatically generated by CM/ECF (and which are visible at the top of each page in the filed document), and not the documents' internal pagination.

The trial court denied Petitioner's motion to suppress, finding that the fillers in the photo array "were sufficiently similar in appearance" to Petitioner and the subsequent lineup constituted "a fairly representative panel upon which a witness could make a reliable identification." ECF No. 7-3 at 61.

**B. Jury Trial**

Petitioner's jury trial commenced on November 2, 2015. *See* ECF No. 7-4, at 1 (start of trial); *id*. at 19–20 (stating date). While the defense called no witnesses, nor did Petitioner testify, the defense asserted that Petitioner's actions had been justified. Defense counsel argued in summation that Petitioner was not only justified in firing his gun at Beckles and Williams after he saw Beckles draw a weapon, but also encouraged the jury to "look at that videotape" which, according to the defense, showed Petitioner retreating and hiding before shooting. ECF No. 7-7 at 12–14.

The crux of Petitioner's claim for habeas relief stems from testimony relating to the Argus surveillance video. The Argus video was first introduced and played for the jury during the testimony of Luis Paulino.[2] ECF No. 7-4 at 60. Not only was Paulino present in the deli at the time June first hit Petitioner and for the timeframe during which Petitioner repeatedly left and reentered the deli, but Paulino also watched the events of the shooting via his store's surveillance video feed.[3] Paulino's initial description of the shooting lined up with the events as they played out on the

---

[2] Paulino's testimony can be found at ECF No. 7-4 at 28–129.

[3] The deli's surveillance video provided a live feed but was not recorded.

Argus video. As such, Paulino identified Petitioner, Beckles, and Williams — all of whom were regulars at his deli — on the video. He explained that he could see Petitioner with a gun and saw muzzle flashes as the gun was fired.

The Argus video was played a second time during the testimony of Homicide Detective Richard Amato.[4] ECF No. 7-5 at 116. Det. Amato was not present during the shooting, but testified that the footage was recovered as part of the murder investigation and that he viewed the footage multiple times prior to trial. As the video played, Det. Amato described to the jury what he saw on the video screen: he identified Petitioner, pointed out the gun in his left hand, noted the times Petitioner raised and lowered his weapon, and highlighted how Petitioner appeared to be "taking cover" after Beckles drew his own weapon. ECF No. 7-5 at 129. Defense counsel did not object to any of this testimony until the prosecutor's questions began to elicit answers that led the detective to describe his own inferences about what had transpired, rather than strictly explaining what was shown on the video.[5] ECF No. 7-5 at 130–45. These objections to the narration were all sustained.

---

[4] Amato's testimony can be found at ECF No. 7-5 at 109–65.

[5] Specifically, the court sustained defense counsel objections to (1): the prosecutor asking, "Does that indicate anything to you?"; Detective Amato stating, "It looks like his gun may have jammed"; (2) the prosecutor asking, "What does it appear is going on to you and what is that based on?"; Detective Amato beginning to say, "it appeared –"; (3) Detective Amato stating, "It appears that the gun is back down"; and (4), Detective Amato stating, "It appears that –," which counsel explained was an "ongoing objection to the use of 'appears' and 'seems' with regard to the descriptions." ECF No. 7-5 at 130–45.

The jury deliberated for two days, during which time they requested to rewatch the surveillance video.  Though the jury initially requested a readback of Det. Amato's testimony, they later withdrew that request.  ECF No. 7-7 at 125–27.  On November 12, 2015, the jury found Petitioner guilty of two counts of second-degree murder and one count of criminal possession of a weapon.  ECF No. 7-7 at 132–36.

On December 2, 2015, the trial court sentenced Petitioner to consecutive sentences of forty years to life in prison for each count of second-degree murder, and a concurrent term of fifteen years determinate plus five years of post-release supervision for weapons possession.  *See* ECF No. 1 at 1; ECF No. 7 at 3.[6]

## C. Post-Conviction Proceedings

### 1. Motion to Set Aside Verdict and First Motion to Vacate Judgment

In a *pro se* motion dated November 24, 2015, Petitioner moved to set aside the verdict pursuant to N.Y. Crim. Proc. Law § 330.30, alleging generally that he was innocent.  ECF No. 7-8 at 3–6.  Petitioner also moved to vacate the judgment of conviction pursuant to N.Y. Crim. Proc. Law § 440.10 in a *pro se* pleading dated December 23, 2015.  ECF No. 7-8 at 9–16.  He argued that (1) the surveillance video had been altered; (2) witness testimony was coerced, perjured, and contained discrepancies; and (3) the evidence in general was unreliable and insufficient to sustain his conviction.  ECF No. 7-8 at 15.

---

[6] A transcript of Petitioner's sentencing hearing was not included as part of the state court record.

By decision and order dated February 19, 2016, the trial court denied both of Petitioner's motions.  ECF No. 7-8 at 25–27.  With regard to the § 330.30 motion, the court denied the motion as moot because it was "untimely."  ECF No. 7-8 at 25 (citing N.Y. Crim. Proc. Law § 330.30).[7]  As for the § 440.10 motion, the trial court denied Petitioner's first two claims on their merits, finding that the allegations were unsupported and, "based on the facts and circumstances known to the court, there is no reasonable possibility that the allegations are true."  ECF No. 7-8 at 25–26 (citing N.Y. Crim. Proc. Law § 440.30(4)).[8]  On the other hand, Petitioner's sufficiency claim was denied on the procedural ground that record-based claims may only be raised on direct appeal.  ECF No. 7-8 at 26 (citing N.Y. Crim. Proc. Law § 440.10(2)(b)).[9]

Petitioner did not seek leave to appeal the trial court's decision.

---

[7] N.Y. Crim. Proc. Law § 330.30 requires that a 330.30 motion be made "[a]t any time after rendition of a verdict of guilty and before sentence."  Though Petitioner's motion is dated before his sentencing, the motion was not received by the District Attorney Clerk's Office until December 3, 2025, after his sentencing.  *See* ECF No. 7-8 at 2.

[8] Upon considering the merits of a motion to vacate judgment, N.Y. Crim. Proc. Law § 440.30(4)(d) allows the court to "deny it without conducting a hearing if . . . [a]n allegation of fact essential to support the motion . . . is made solely by the defendant and is unsupported by any other affidavit or evidence, and [ ] under these and all the other circumstances attending the case, there is no reasonable possibility that such allegation is true."

[9] N.Y. Crim. Proc. Law § 440.10(2)(b) provides that "the court must deny a motion to vacate a judgment when . . . [t]he judgment is, at the time of the motion, appealable or pending on appeal, and sufficient facts appear on the record with respect to the ground or issue raised upon the motion to permit adequate review thereof upon such an appeal."

### 2. Second Motion to Vacate Judgment

In a subsequent *pro se* § 440.10 motion, dated July 23, 2019, Petitioner argued that his defense counsel was ineffective for failing to (a) file a motion to dismiss after Petitioner did not appear at the grand jury, (b) independently investigate the forensic evidence, (c) call a forensic expert witness, (d) present evidence that the victims were drug dealers, and (e) obtain materials from the prosecution that was withheld in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  ECF No. 7-8 at 29–64. Respondent argued that all of Petitioner's claims were procedurally barred because there were sufficient facts in the record to permit adequate review on direct appeal, *see* N.Y. Crim. Proc. Law § 440.10(2)(b), and moreover, the court had discretion to deny Petitioner's motion because Petitioner had been in a position to raise the claims in his first § 440.10 motion but failed to do so, *see* N.Y. Crim. Proc. Law § 440.10(3)(c).[10]  ECF No. 7-8 at 68–94.

The trial court denied Petitioner's second § 440.10 motion on June 25, 2020, finding that all of the claims must be dismissed pursuant to N.Y. Crim. Proc. Law § 440.10(2)(b), but in any event, they were all meritless.  ECF No. 7-8 at 96–103.  Once again, Petitioner did not seek leave to appeal this decision.

---

[10] Under N.Y. Crim. Proc. Law § 440.10(3)(c), "the court may deny a motion to vacate a judgment when . . . [u]pon a previous motion made pursuant to this section, the defendant was in a position adequately to raise the ground or issue underlying the present motion but did not do so."

### 3. Direct Appeal

While his second motion to vacate judgment was pending, Petitioner appealed his conviction to the New York Supreme Court, Appellate Division, Second Department ("Appellate Division"), arguing, through counsel, that (1) Detective Amato's narration of the surveillance video constituted improper lay opinion testimony which denied Petitioner a fair trial and (2) his excessive sentence should be reduced in the interest of justice. ECF No. 7-8 at 105–39. Specifically, Petitioner contended that Detective Amato, who was neither an eyewitness nor an expert, gave testimony in which he "editorialized at length" about the actions depicted in the video and stated with "authority" what was happening throughout, leaving no room for the jury's own interpretation. *See* ECF No. 7-8 at 110, 128–36. According to Petitioner, allowing this testimony could not be considered harmless error because without it, the jury "may have entertained greater doubts about whether [Petitioner] was the initial aggressor." ECF No. 7-8 at 134.

Respondent argued as an initial matter that Petitioner's narrative testimony claim was unpreserved for appellate review when he failed to raise a specific objection before the trial court. ECF No. 7-8 at 158–60. Nevertheless, Respondent maintained that the claim was meritless because all of the defense's narration objections were sustained, and the portions of Detective Amato's testimony to which the defense made no objections were properly admitted to aid the jury, and alternatively, the remaining evidence of Petitioner's guilt rendered any error harmless. ECF No. 7-8 at 161–72. As for Petitioner's sentencing claim, Respondent argued that the sentence need not

be reduced in the interest of justice where it fell within the permissible statutory range, *see* N.Y. Penal Law §§ 70.00(1), (2)(a), (3)(a)(i), and the trial court did not abuse its discretion by running the murder sentences consecutively. ECF No. 7-8 at 173–75.

On October 21, 2020, the Appellate Division affirmed Petitioner's judgment of conviction. *People v. Correa*, 131 N.Y.S.3d 258 (N.Y. App. Div. 2020). The Appellate Division found unpreserved the contention that the trial court should not have allowed any narration testimony because "defense counsel did not object to the narration [as a whole], only to certain discrete portions of the narration[.]" *Id.* at 1039 (citing N.Y. Crim. Proc. Law § 470.05(2)).[11]  In any event, the Appellate Division considered the merits of Petitioner's claim, concluding that "any error in the admission of this testimony was harmless" because "[i]t is undisputed that [Petitioner] was the shooter," the overwhelming evidence that he "was the initial aggressor who employed deadly physical force" completely negated the justification

---

[11] New York's preservation statute, known as the "contemporaneous objection rule," specifies that:

> [f]or purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same. Such protest need not be in the form of an "exception" but is sufficient if the party made his position with respect to the ruling or instruction known to the court, or if in response to a protest by a party, the court expressly decided the question raised on appeal.

N.Y. Crim. Proc. Law § 470.05(2).

defense, and "there is no significant probability that the jury would have acquitted [Petitioner] had it not been for the admission of the narration testimony." *Id.* (citations omitted). Moreover, the Appellate Division held that Petitioner's sentence was not excessive. *Id.*

Petitioner sought leave to appeal to the New York Court of Appeals, which was denied on January 28, 2021. *People v. Correa*, 36 N.Y.3d 1050 (2021) (Garcia, J.). He did not seek a writ of certiorari with the United States Supreme Court. *See, e.g.*, *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001) ("'[D]irect review,' as used in [28 U.S.C. §] 2244(d)(1)(A), includes direct review by the United States Supreme Court via writ of certiorari . . . .").

## IV.    Habeas Corpus Petition

The instant Petition was timely filed on April 20, 2022. *See* ECF No. 1;[12] *see also Saunders v. Senkowski*, 587 F.3d 543, 547 (2d Cir. 2009) (explaining that one-year limitations period to file habeas petition begins "running upon the expiration of

---

[12] The initial Petition references all of the claims raised in state court, including those from the two unsuccessful 440.10 motions. ECF No. 1 at 2–4. Petitioner concedes that, due to his inability to acquire legal assistance and lack of legal resources, he failed to seek leave to appeal either of the trial court's 440.10 decisions within the necessary time frame, and none of the claims raised therein were fully exhausted in state court. ECF No. 1 at 4; *see* 28 U.S.C. § 2254(b)(1); *Thomas v. Greiner*, 111 F. Supp. 2d 271, 277–78 (S.D.N.Y. 2000) (finding claims procedurally barred by petitioner's failure to seek leave to appeal denial of his 440.10 motion); *Safran v. New York*, No. 22-cv-3177, 2023 WL 3306932, at *2-3 (E.D.N.Y. May 6, 2023) (distinguishing between New York State's appellate procedures and post-conviction review); *cf. Garner v. Superintendent*, 10-cv-1406, 2012 WL 3929944, at *6 n.6 (N.D.N.Y. Sept. 10, 2012). Accordingly, Petitioner does not dispute that only those claims raised on direct appeal are eligible for federal habeas review. *See* ECF No. 1 at 4.

the 90-day period during which [petitioner] could have filed for direct review of his conviction"). Petitioner also filed a "First Amended Petition" via letter dated July 12, 2022, reasserting his narrative testimony and excessive sentence claims. *See* ECF No. 6. Respondent filed its opposition and supporting memorandum of law on September 14, 2022, arguing that the narration testimony claim was procedurally barred from review and, regardless, both it and the sentencing claim are without merit. *See* ECF No. 7. Petitioner sought an extension of time to file a reply to the opposition, *see* ECF No. 8, which the Court subsequently granted. *See* Order dated October 14, 2022. Soon after, on October 26, 2022, this matter was reassigned to the undersigned. Petitioner filed a responsive pleading on December 12, 2022, wherein he challenged Respondent's procedural bar argument and reiterated that the narration testimony denied him a fair trial. *See generally* ECF No. 9.

## LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a person in custody pursuant to a state-court judgment may seek a writ of habeas corpus on the grounds that he is being held "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A federal court may not review a habeas petition until after the petitioner "has exhausted the remedies available" in state courts, 28 U.S.C. § 2254(b)(1)(A), and even then, habeas relief may only be obtained for a violation of federal law. *Estelle v. McGuire,* 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Accordingly, "[s]tate remedies are deemed

exhausted when a petitioner has: (i) presented the federal constitutional claim asserted in the petition to the highest state court . . . and (ii) informed that court (and lower courts) about both the factual and legal bases for the federal claim." *Ramirez v. Att'y Gen. of State of New York*, 380 F.3d 87, 94 (2d Cir. 2001) (citing *Picard v. Connor*, 404 U.S. 270, 276–77 (1971)).

Federal review of state convictions is further constrained by the procedural default doctrine. Generally, federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). Reliance on state law grounds, whether a substantive or procedural rule, must be "clear from the face" of the state court's opinion to satisfy the independent requirement. *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir. 2000) (citing *Coleman*, 501 U.S. at 735); *see Bierenbaum v. Graham*, 607 F.3d 36, 47 (2d Cir. 2010). To establish adequacy for a state procedural rule, the state procedural rule relied upon must be "firmly established and regularly followed" by courts of that state. *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (quoting *Ford v. Georgia*, 498 U.S. 411, 423–24 (1991)). As is relevant here, the Second Circuit has repeatedly held that New York's preservation requirements, including the contemporaneous objection rule laid out in N.Y. Crim. Proc. Law § 470.05(2), are acceptable "firmly established and regularly followed" state procedural rules. *Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011); *accord Garvey v. Duncan,* 485 F.3d 709, 718 (2d Cir. 2007); *Garcia*, 188 F.3d at 78–79.

15

Even when a state court rests its decision on procedural grounds that would otherwise be deemed independent and adequate, the Second Circuit has found certain situations where an alternative holding accompanying that determination may be considered an "[adjudication] on the merits" sufficient to open the claim to federal habeas review. *Zarvela v. Artuz*, 364 F.3d 415, 417 (2d Cir. 2004) (per curiam) (citing *Brown v. Artuz*, 283 F.3d 492, 498 (2d Cir. 2002)) (concluding that state court adjudicated claim on merits where it found "petitioner's claim to be unpreserved, and, *in any event*, without merit" (emphasis added));[13] *see also Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001) ("[A] state court 'adjudicate[s]' a state prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment." (quoting 28 U.S.C. § 2254(d)(1))).

When a state court has adjudicated a federal claim on the merits, a federal court may not grant a habeas petition on that claim unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[13] On the contrary, it is not considered an adjudication on the merits if a state court rejects a claim on procedural grounds, then proceeds to state that, "if the merits were reached, the result would be the same." *Bell v. Miller*, 500 F.3d 149, 154-55 (2d Cir. 2007) (finding that such statement is not alternative holding, but merely a "contrary-to-fact construction") (citing *Zarvela*, 364 F.3d at 417); *accord Clark v. Perez*, 510 F.3d 382, 394 (2d Cir. 2008) (finding no adjudication on merits where holding is framed as "were the court to consider defendant's claim . . . it would find the claim completely meritless," because, by its own terms, holding is based on procedural bar and merits were not considered).

16

28 U.S.C. § 2254(d); *see Harrington v. Richter*, 562 U.S. 86, 97–98 (2011); *Waiters v. Lee*, 857 F.3d 466, 477 (2d Cir. 2017).

"Where a State court decision adjudicates a petitioner's claim on the merits, [the decision must be] accorded substantial deference." *Fischer v. Smith*, 780 F.3d 556, 560 (2d Cir. 2015); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) (AEDPA deference "demands that state-court decisions be given the benefit of the doubt" (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). Such deference applies "even if the state court does not explicitly refer to either the federal claim or to relevant federal case law" in its decision. *Kuhlman*, 261 F.3d at 312.

For the purposes of federal habeas review, a state court decision is "contrary to" clearly established federal law only in circumstances when the state court either applies a rule different from the governing law set forth by the Supreme Court, or if it arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). Similarly, an "unreasonable application" of clearly established federal law occurs when a state court identifies the correct governing legal principle, but unreasonably applies it to the facts of the petitioner's case. *Id.* at 413. This inquiry prevents habeas courts from granting relief where the state court's application of Supreme Court precedent was merely incorrect or erroneous, and permits habeas relief only in those rare circumstances where the state court's decision was objectively unreasonable. *Id.* at 409–10. Only when there is "no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents" may habeas

17

relief be granted. *Harrington*, 562 U.S. at 102–03; *accord Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012) (per curiam).

Additionally, AEDPA forecloses "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Parker v. Matthews*, 567 U.S. 37, 38 (2012) (per curiam) (quoting *Renico*, 559 U.S. at 779). A state court's factual findings are not unreasonable under 28 U.S.C. § 2254(d)(2) simply because the reviewing court would have reached a different conclusion. *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see also* 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."). Once again, the question is "not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schiro v. Landrigan*, 550 U.S. 465, 473 (2007).

## DISCUSSION

The instant Petition sets forth two grounds for habeas relief: (1) Petitioner's due process right to a fair trial was violated by the erroneous introduction of narration testimony, and (2) his indeterminate sentence of forty years to life in prison is excessive. ECF No. 1 at 2; ECF No. 6. Petitioner has exhausted the available state remedies as to both claims, having raised them on direct appeal to the Appellate Division, *People v. Correa*, 131 N.Y.S.3d 258 (N.Y. App. Div. 2020), and subsequently seeking leave to appeal to the New York Court of Appeals, *People v. Correa*, 36 N.Y.3d

1050 (2021). *See* 28 U.S.C. § 2254(b)(1). Because the Court of Appeals summarily denied Petitioner leave to appeal, this Court "[looks] through" to the Appellate Division's opinion as the last reasoned decision to evaluate the claims in state court. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018) (presuming "that the unexplained decision adopted the same reasoning"); *McCray v. Capra*, 45 F.4th 634, 640 (2d Cir. 2022).

## I.   Narration Testimony

Petitioner first claims that the trial court violated his due process rights and denied him a fair trial by allowing Detective Amato to narrate the surveillance video as it was played for the jury. ECF No. 1 at 2; ECF No. 9 at 12–16. Specifically, Petitioner contends that admission of this "lay opinion testimony" was an evidentiary error and, because it hindered the jury's ability to "draw the appropriate inferences" from the video, such error was not harmless. ECF No. 9 at 12–16.

The Appellate Division rejected this claim, initially denying it on the ground that the "contention that the [trial] court should not have allowed any narration" was unpreserved for appellate review. *Correa*, 131 N.Y.S.3d at 258 (citing N.Y. Crim. Proc. Law § 470.05(2)).[14] While it would not have been improper for the state court

---

[14] As discussed above, the Appellate Division found Petitioner's narration claim unpreserved for appellate review because "defense counsel did not object to the narration [as a whole], only to certain discrete portions of the narration, which objections were, for the most part, sustained." *Correa*, 131 N.Y.S.3d at 258; *see also* n.5, *supra*. Despite Petitioner's argument to the contrary, ECF No. 9 at 7–11, the state court's reliance on its own preservation rule is well-accepted as an independent and adequate procedural bar to federal habeas review. *See e.g.*, *Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011) ("[W]e have held repeatedly that the contemporaneous objection rule is a firmly established and regularly followed New York procedural rule."); *Garcia*, 188 F.3d at 82 (finding failure to "bring to the trial court's attention the claim that Garcia later attempted to advance on appeal . . . ran afoul of New

to end the analysis there and rest its decision on a procedural default, *e.g.*, *Coleman*, 501 U.S. at 729–30 (1991), the Appellate Division proceeded with the alternative holding that, "[i]n any event, any error in the admission of [Detective Amato's] testimony was harmless," *Correa*, 131 N.Y.S.3d at 258.

Because the Appellate Division's ultimate conclusion amounts to an alternative holding, *Zarvela*, 364 F.3d at 417, as opposed to a "contrary-to-fact" statement, *Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007), the finding of harmless error is considered an adjudication on the merits.  *Cf. Brown v. Davenport*, 596 U.S. 118, 127 (2022) ("No one questions that a state court's harmless-error determination qualifies as an adjudication on the merits under AEDPA.").  Accordingly, the question before this Court is not whether the trial court erred in allowing the testimony, but rather whether the Appellate Division's harmless error determination is in conflict with Supreme Court precedent.

In light of the Supreme Court's decision in *Brown v. Davenport*, habeas review of a state court's merits determination of harmless error must occur in two parts. *Krivoi v. Chappius*, No. 21-2934-PR, 2022 WL 17481816, at *3 (2d Cir. Dec. 7, 2022).

The first of these tests was laid out by the Supreme Court in *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  Under *Brecht*, when a state court has

---

York's legitimate requirement that objections be raised in a way that gives the trial court the opportunity to remedy the problem and thereby avert reversible error." (internal quotation marks omitted)).

To the extent Petitioner argues that the Appellate Division was incorrect in finding the claim unpreserved, *see* ECF No. 9 at 8, the Court need not address this issue as the Appellate Division's alternative holding of "harmless error" is otherwise entitled to merits review.  *See Zarvela*, 364 F.3d at 417.

found a constitutional violation to be harmless beyond a reasonable doubt (by applying the harmless error standard from *Chapman v. California*, 386 U.S. 18 (1967)), a habeas petitioner must show that an error had a "substantial and injurious" effect or influence on the jury's verdict. *Brecht*, 507 U.S. at 622–23 (internal quotation marks omitted). The Supreme Court recently held that, in addition to the *Brecht* standard, federal courts must apply the AEDPA standard laid out in § 2254(d)(1). *Brown v. Davenport*, [596 U.S. 118, 127–28,] 142 S. Ct. 1510, 1520 (2022). In other words, [the petitioner] must prevail under the *Brecht* "substantial and injurious" standard, *and* he must show that the state court's harmless error determination was an unreasonable application of federal law as determined by the Supreme Court (i.e., that the state court's harmless error determination was an unreasonable application of *Chapman*).

*Krivoi*, 2022 WL 17481816 at *3. While these standards need not be applied in any particular order, the Court will first address whether the Appellate Division's determination was an unreasonable application of *Chapman* per AEDPA. Then, the Court will address whether the *Brecht* standard has been met.

### A. AEDPA/Chapman

Without opining one way or the other whether the trial court did err in allowing Detective Amato's narration testimony, the Appellate Division ruled that "any error in the admission of this testimony was harmless" because "[i]t is undisputed that [Petitioner] was the shooter[, t]he evidence was overwhelming that the defendant was the initial aggressor . . . and there is no significant probability that the jury would have acquitted [Petitioner] had it not been for the admission of the narration testimony." *Correa*, 131 N.Y.S.3d at 258. The question now is whether the Appellate Division "act[ed] contrary to or unreasonably applie[d] [the Supreme] Court's preexisting and clearly established rules" such that "every fairminded jurist" would

reach a different conclusion than the state court did when applying the same legal principle. *Brown*, 596 U.S. at 144–45.

When the harmlessness of an error is at issue on direct appeal, the applicable legal principle is the standard set forth in *Chapman v. California*, which requires that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24 (requiring courts to determine "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction"). Although the Appellate Division did not cite *Chapman* directly, it did cite *People v. Crimmins*, a New York state case that applied the *Chapman* standard. *Correa*, 131 N.Y.S.3d at 258 (citing *Crimmins*, 36 N.Y.2d 230, 242 (1975)); *see Crimmins*, 36 N.Y.2d at 237 (applying the *Chapman* standard); *see also Gutierrez v. McGinnis*, 389 F.3d 300, 308 (2d Cir. 2004) ("for AEDPA deference to attach . . . our Circuit does not require state courts to cite federal precedent when disposing of that claim. Therefore, the question is whether the Appellate Division reasonably applied *Chapman* or New York's equivalent interpretation." (citation omitted)). *Crimmins* requires the Appellate Division to determine whether "there is no reasonable possibility that the error might have contributed to defendant's conviction," 36 N.Y.2d at 237 — the very test cited with approval in *Chapman*, 386 U.S. at 24, and relied on by the Appellate Division here, *Correa*, 131 N.Y.S.3d at 258 (finding "no significant probability that the jury would have acquitted [Petitioner]").

Respondent argues that the Appellate Division's finding of harmless error was not unreasonable because there was no dispute that Petitioner shot both victims, and his justification defense was fully negated by the "weighty" evidence of his role as the initial aggressor, separate and apart from Det. Amato's narration testimony.   ECF No. 7 at 15 (citing N.Y. Penal Law § 35.15(1)(b)).  Respondent cites the video evidence and witness testimony at trial that Petitioner "took out a gun, angrily pointed the gun twice at the first victim Tevin Beckles, stormed up and down the block for eight minutes with the gun drawn[,] . . . got in Beckles's face, and pointed the gun at Beckles two more times before Beckles eventually took out a gun, and then [Petitioner] fired the only shots."  ECF No. 7 at 15–16.  Moreover, Respondent asserts that any error was minimized by the trial court's repeated instructions highlighting how "the jury's evaluation of the video controls and Detective Amato's narration was merely an aid," as well as the jury's multiple viewings of the surveillance video — both before and after the concerning testimony.  ECF No. 7 at 14–15.  In light of this overwhelming evidence, Respondent contends, the Appellate Division finding "no significant probability" of a different outcome was not unreasonable.  *See* ECF No. 7 at 16; *Correa*, 131 N.Y.S.3d at 258.

Petitioner does not expressly argue that the state court's harmless error ruling was an unreasonable application of clearly established federal law.  However, the Court construes the Petition liberally and finds it to raise the contention that the Appellate Division's finding of harmless error was unreasonable because, but for Detective Amato's narration testimony, the outcome of his trial would have been

different.  ECF No. 9 at 15–16.  Petitioner concedes that the evidence was legally sufficient to prove that he murdered Beckles and Williams.  But he nevertheless argues that allowing Detective Amato's narration testimony was not harmless because there was "a [lack] of direct evidence linking [him] to the crime and [ ] conflicting witness testimony regarding Petitioner's justification defense."  ECF No. 9 at 15.

When a state court has applied *Chapman*, as it did here, 28 U.S.C. § 2254(d)(1) "requires a habeas petitioner to prove that the state court's decision was unreasonable." *Brown*, 596 U.S. at 135 (citing *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *Fry v. Pliler*, 551 U.S. 112, 119 (2007)).  "To accomplish that, a petitioner must persuade a federal court that no 'fair minded juris[t]' could reach the state court's conclusion under [the Supreme] Court's precedents." *Brown*, 596 U.S. at 135 (citing *Davis v. Ayala*, 576 U.S. 257, 269 (2015)).  Petitioner has not done so.

When a criminal defendant asserts the defense of justification, New York State law requires that the prosecution "prove beyond a reasonable doubt that the defendant's actions were not justified." *People v. Williams*, 77 N.Y.S.3d 216, 216 (N.Y. App. Div. 2018) (citing N.Y.P.L. § 25.00(1)).  New York Penal Law further provides that "a defendant is never justified in using deadly physical force if that defendant is the 'initial aggressor': the first person in an altercation who uses or threatens the imminent use of deadly physical force." *People v. Brown*, 33 N.Y.3d 316, 320–21 (2019) (citing N.Y.P.L. § 35.15(1)).  As for what constitutes such a threat, the New York Court of Appeals articulated in *Brown* that:

> [T]he imminent threat to use a gun constituted the threat of deadly physical force even if the gun is never fired. *People v. Dodt*, 61 N.Y.2d 408 (1984). "[T]he threat presented by a gun does not depend to any significant extent on the manner in which it is used. So long as a gun is operable, it constitutes deadly physical force, and a threat to use a gun, such as was made here, can only be understood as a threat that the weapon is operable." *Id.* at 414–15.
>
> Thus, the imminent threat to use a gun against another is, necessarily, a threat of deadly physical force. *The first person to make such an imminent threat is, therefore, the initial aggressor with respect to deadly physical force.*

33 N.Y.3d at 322 (emphasis added).

Here, while Petitioner mounted a vigorous justification defense, there was indeed a substantial array of other evidence from which a reasonable jury could find beyond a reasonable doubt that Petitioner was the initial aggressor. This included evidence presented by the People that, although Beckles did eventually draw a weapon, it was in response to Petitioner first brandishing his own gun and repeatedly pointing it at both Beckles and Williams. ECF No. 7-4 at 68–71. It also included evidence that while Petitioner saw Beckles produce the gun and "retreated" to seek cover behind a fence, Petitioner never took his aim off of Beckles. ECF No. 7-5 at 75–76; ECF No. 7-5 at 141–42; ECF No. 7-7 at 12–14. Moreover, the ballistics evidence established that only one gun was fired — a .40 caliber handgun that was not the one belonging to Beckles. ECF No. 7-4 at 180–85; ECF No. 7-6 at 11. Finally, and perhaps most importantly, the Augers video itself was admitted and played for the jury multiple times, twice without the testimony of Detective Amato. ECF No. 7-4 at 60; ECF No. 7-7 at 125–27. The jury was repeatedly instructed to rely on its own assessment of the events on the video and not to substitute Det. Amato's inferences

for the jurors' own independent judgment.  ECF No. 7-5 at 143, 145, 152.  This evidence belies Petitioner's claim that there was a "lack of direct evidence linking" him to the crime and that those portions of Det. Amato's testimony that constituted narration, even if admitted in error, were not harmless; at the very least, the record shows that the Appellate Division did not unreasonably find otherwise.  ECF No. 9 at 15.  In sum, the Court finds no error in the state court's conclusion that the narration testimony alone did not unfairly prejudice Petitioner's justification defense or otherwise contribute to the verdict.  Accordingly, the Appellate Division did not unreasonably apply *Chapman*'s standard in determining that any error arising from Detective Amato's testimony was harmless.  *Correa*, 131 N.Y.S.3d at 258.

### B. Brecht

Having assessed the Appellate Division's decision under 28 U.S.C. § 2254(d)(1), the question turns to whether any possible constitutional error had a "substantial and injurious" effect on the verdict as articulated in *Brecht*.  Notably, a "'reasonable possibility' that the [constitutional] error was harmful" does not satisfy this standard.  *Davis*, 576 U.S. at 268 (quoting *Brecht*, 507 U.S. at 637).  Rather, an error is harmless unless it results in "actual prejudice."  *Id.* at 267.  Moreover, the reviewing court must hold "grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict."  *O'Neal v. McAninch,* 513 U.S. 432, 436 (1995); *Davis*, 576 U.S. at 267–68.  As the *O'Neal* court explained,

> [b]y "grave doubt" we mean that, in the judge's mind, the matter is so
> evenly balanced that he feels himself in virtual equipoise as to the

> harmlessness of the error. We conclude that the uncertain judge should
> treat the error, not as if it were harmless, but as if it affected the verdict
> (i.e., as if it had a "substantial and injurious effect or influence in
> determining the jury's verdict").

513 U.S. at 435. "That is to say, if a judge has 'grave doubt' about whether an error

affected a jury in this way, the judge must treat the error as if it did so." *Id.* at 438;

*cf. Brown*, 596 U.S. at 136 ("[W]here AEDPA asks whether *every* fairminded jurist

would agree that an error was prejudicial, *Brecht* asks only whether a federal habeas

court *itself* harbors grave doubt about the petitioner's verdict.").

In assessing "whether the erroneous admission of evidence had a substantial

and injurious effect on the jury's decision, [the Court considers] the importance of the

. . . wrongly admitted [evidence], and the overall strength of the prosecution's case."

*Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000).

> In assessing whether the erroneous admission of evidence had a
> substantial and injurious effect on the jury's decision, [this Court]
> consider[s] the importance of the wrongly admitted evidence, and the
> overall strength of the prosecution's case. The importance of wrongly
> admitted evidence is determined by the prosecutor's conduct with
> respect to the evidence, whether the evidence bore on an issue plainly
> critical to the jury's decision, and whether it was material to the
> establishment of the critical fact, or whether it was instead corroborated
> and cumulative.

*Wood v. Ercole*, 644 F.3d 83, 94 (2d Cir. 2011) (cleaned up).

Even if the Court were to find that Det. Amato's testimony during the video

went beyond what was permissible, that testimony did not result in "actual

prejudice," as it did not cause a "substantial and injurious" effect on the verdict.

*Davis*, 576 U.S. at 267. As discussed *supra*, the Augers video itself was admitted and

played for the jury multiple times. ECF No. 7-4 at 60; ECF No. 7-7 at 125–27. Twice,

it was played without Detective Amato's testimony, and the trial court repeatedly

27

instructed the jury to rely on its own assessments of the video, not any inferences made by Detective Amato. ECF No. 7-5 at 143, 145, 152. Moreover, the additional evidence discussed *supra* shows that the "overall strength of the prosecution's case" was strong, including that Beckles' eventual drawing of his gun was in response to Petitioner first brandishing his own gun and repeatedly pointing it at Beckles and Williams, ECF No. 7-4 at 68–71, that Petitioner never took his aim off Beckles, ECF No. 7-5 at 75–76, 141–42; ECF No. 7-7 at 12–14, and that ballistics evidence established that only one gun was fired, and that it was not the firearm belonging to Beckles, ECF No. 7-4 at 180–85; ECF No. 7-6 at 11.

## II.  Excessive Sentence

Petitioner next contends that his aggregate sentence of forty years to life in prison is excessive "given the aberrational nature" of the crime and the fact that he was 62 years old at the time of his appeal. ECF No. 1 at 2. In state court, Petitioner implored the Appellate Division to reduce his sentence in the interest of justice on the grounds that the "imposition of consecutive prison sentences . . . all but ensure[s] that [Petitioner] will die in prison."[15] ECF No. 7-8 at 137–39. The Appellate Division rejected this claim outright, concluding without elaboration that the "sentence imposed was not excessive." *Correa*, 131 N.Y.S.3d at 258 (citing *People v. Suitte*, 455 N.Y.S.2d 675 (N.Y. App. Div. 1982)).

---

[15] At the time of sentencing, Petitioner was 62 years old. *See* ECF No. 1 at 2; ECF No. 7-8 at 126-27.

"Under New York law, the State appellate courts have the authority to reduce a sentence in the interest of justice without finding an abuse of sentencing discretion by the trial judge." *Thomas v. Greiner*, 111 F. Supp. 2d 271, 279–80 (S.D.N.Y. 2000); *see Suitte*, 455 N.Y.S.2d at 675 (explaining why and when New York appellate courts may "substitute [their] own discretion"); *see also* N.Y. Crim. Proc. Law §§ 470.15(3), (6)(b). A federal habeas court, however, "has no such authority," *see Greiner*, 111 F. Supp. at 279-80, and "a claim that a sentence should be reduced in the interest of justice does not allege a violation of a federally protected right," *Baide-Ferrero v. Ercole*, No. 06-cv-6961, 2010 WL 1257615, at *4 (S.D.N.Y. Mar. 31, 2010). *See also Medina v. Greene*, No. 03-cv-8646, 2004 WL 2809196, at *4 (S.D.N.Y. Dec. 7, 2004) (concluding that, by appealing to Appellate Division's power under N.Y. Crim. Proc. Law § 470.15 to reduce excessive sentence in interest of justice, petitioner "did not fairly present the excessive sentence claim in federal constitutional terms").

Moreover, even liberally construing this claim to assert that Petitioner's sentence is so disproportionately long that it violates the Eighth Amendment's protection against cruel and unusual punishment, he is not entitled to habeas relief. *See Herrera v. Artuz*, 171 F. Supp. 2d 146, 151 (S.D.N.Y 2001). A state sentence does not violate the constitution where the imposed sentence falls within the range prescribed by state law. *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (citing *Underwood v. Kelly*, 692 F. Supp. 146 (E.D.N.Y. 1988), *aff'd*, 875 F.2d 857 (2d Cir. 1989)); *Chisholm v. Henderson*, 736 F. Supp. 444, 449 (E.D.N.Y. 1990). Here, the trial court sentenced Petitioner to consecutive terms of twenty years to life in prison for

29

each count of second-degree murder and a concurrent term of fifteen years for criminal possession of a weapon. An indeterminate sentence of twenty years to life in prison for each count of second-degree murder is permitted under New York Law, N.Y. Penal Law §§ 70.00(2)(a), (3)(a)(i), as is a determinate sentence of fifteen years for second-degree criminal possession of a weapon, N.Y. Penal Law §§ 70.02(1)(b), (3)(b). It is undisputed that Petitioner's sentence falls within the applicable range, and this Court has no authority to question its validity.

To the extent Petitioner challenges the trial court's decision to run his second-degree murder sentences consecutively, the issue remains a matter of state law and is not cognizable under federal habeas review. *See, e.g., Ashby v. Senkowski*, 269 F. Supp. 2d 109, 115 (E.D.N.Y. 2003) ("A challenge to the imposition of consecutive sentences fails to present an issue of constitutional dimension[.]"); *Davis v. Herbert*, No. 02-cv-04908, 2003 WL 23185747, at *15 (E.D.N.Y. Oct. 24, 2003) ("Whether the sentence could be consecutive was a matter of state law and raises no Constitutional issue."); *cf. United States v. Jaramillo-Montoya*, 834 F.2d 276, 279 (2d Cir. 1988) (explaining how imposition of consecutive sentences violates the Eighth Amendment only under extraordinary circumstances). In any event, New York trial courts have the discretion to impose consecutive sentences for acts proven to be separate and distinct, including acts of murder, and the trial court's decision here did not overstep what is permissible under state law. *See, e.g., People v. Brathwaite*, 63 N.Y.2d 839, 843 (1984) (upholding consecutive sentences for convictions on two counts of felony murder and reasoning that "although the two deaths may be said to have occurred in

30

the course of a single extended transaction – the robbery – it was separate 'acts' which caused the deaths of the owner and the clerk"); N.Y. Penal Law § 70.25(2).

This is not to say that Petitioner has no remaining avenues to try and obtain a reduction in his sentence. To the extent that he continues to assert that he acted in self-defense and that, even if he is legally responsible for Beckles' and Williams' deaths, the overall circumstances under which he committed the shootings are far more mitigating than the sentencing court recognized, he is certainly free to raise those issues along with any other grounds for earlier release in a future application for executive clemency, or for parole if and when he becomes eligible.[16] The current Kings County District Attorney has also created a unit within his office to review convicted persons' applications for clemency and/or parole, and its website indicates that the Office may not oppose applications from persons who make compelling claims that they should be granted clemency or parole, or are otherwise entitled to a sentence reduction. *See* Kings County District Attorney, *Post-Conviction Justice Bureau*, The Brooklyn District Attorney's Office, http://www.brooklynda.org/post-conviction-justice-bureau/ (last visited April 2025). But this Court's authority to review the length of Petitioner's sentence on federal habeas is strictly constrained.

In sum, because Petitioner's sentences fall within the applicable statutory range and the trial court did not abuse its discretion in imposing sentence, the

---

[16] At present, it appears that Petitioner will not be eligible for parole until 2053, at which time he will be approximately 99 years old. However, to the extent the New York State legislature enacts a change in law and permits earlier applications from persons like Petitioner, he may become eligible sooner.

sentence he received does not violate the Eighth Amendment's prohibition on "cruel and unusual punishment."

## CONCLUSION

Petitioner has not shown any basis for habeas relief under the demanding standards required by 28 U.S.C. § 2254.  Accordingly, the petition is denied.

Additionally, a certificate of appealability will not issue, because Petitioner has not made a substantial showing of the denial of a constitutional right.  *See* 28 U.S.C. § 2253.  Pursuant to 28 U.S.C. § 1915(a)(3), the Court certifies that any appeal taken from this decision and order would not be taken in good faith and therefore *in forma pauperis* status is denied for purposes of an appeal.  *Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

SO ORDERED.


*/s/ Nina R. Morrison*

NINA R. MORRISON
United States District Judge


Dated: April 28, 2025
       Brooklyn, New York